**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

INGE UYS,

      **Plaintiff**,                              Case No.: 6:20-cv-01143- CEM-EJK

v.

COLIN ALWIN HARRIS and COLHAR
CINEMA, LLC,

      **Defendant**.

_____/

**DEFENDANTS', COLIN ALWIN HARRIS AND COLHAR CINEMA, LLC,**

**MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW**

**IN SUPPORT OF MOTION TO DISMISS**

**ORAL ARGUMENT REQUESTED**

THE LOMNITZER LAW FIRM, P.A.
7999 N. Federal Highway, Ste. 202
Boca Raton, FL 33487
Telephone: (561) 953-9300
Fax: (561) 953-3455
*Attorneys for Defendants*

i

**Table of Contents**

I.    PRELIMINARY STATEMENT ...................................................................................................... 1

II.   FACTS .......................................................................................................................................... 3

    A.   The Parties ............................................................................................................................ 4

        1.   Defendants......................................................................................................... 4

        2.   Plaintiff Inge Uys ............................................................................................... 5

    B.   The Written Agreements ..................................................................................................... 7

        1.   The Appearance Release .................................................................................. 7

        2.   The January 1, 2013 Letter of Agreement .................................................... 7

        3.   June 1, 2013 Letter of Agreement ................................................................... 8

    C.   Ms. Uys's Nude Appearances in the Film...................................................................... 11

    D.   Ms. Uys Expressly Admits Defendants Are Sole Copyright Owners of the Film ............................ 12

    E.   Procedural History ............................................................................................................. 13

III.  ARGUMENT ............................................................................................................................... 14

    A.   Ms. Uys's  Claims are Barred by Three Signed Agreements and Must be Dismissed .................... 15

        1.   The Personal Release is Documentary Evidence that Completely Disposes of the Complaint .. 15

    B.   Ms. Uys Cannot Avoid the Plain Terms of Her Agreements .......................................... 18

    C.   Even if Not Barred by Her Releases, Ms. Uys's Claims Fail as a Matter of Law ............................. 18

        1.   Breach of Contract Counts I and II ................................................................ 18

        2.   Promissory Estoppel Count III ....................................................................... 19

        3.   Fraud in the Inducement of a Contract Count IV, Invasion of Privacy (Public Disclosure) Count V, and Intentional Infliction of Emotional Distress Count VI ......................................................... 19

IV.   CONCLUSION............................................................................................................................. 23

Defendants, Colin Harris ("Harris") and Colhar Cinema, LLC ("Colhar Cinema"),  by and through their undersigned attorneys, respectfully submits this memorandum of law in support of its motion to dismiss the Complaint, pursuant to FRCP 12.

I.      PRELIMINARY STATEMENT

Inge Uys aka Inge Eiss is a sometime model actress who wanted a shot at fame. In pursuit of that goal, she auditioned for a lead role of Haima Kellis in a non-union, micro budget, independent film "Haima," (the "Film") produced by Defendant Colhar Cinema and directed by Defendant Harris.  The audition notice describing the role of Haima Kellis indicated in ***bold italic***s that "***this role calls for a short sex scene.  Scene will be shot on a closed set, and the sex will be simulated and handled tastefully***."  Exhibit "B."[1]  In hopes of being selected for role of Haima Kellis, Ms. Uys held herself out to be uninhibited telling the co-actor in her audition tape "I'm ok with you touching me, by the way…Just so you know.  I know some guys are cautious…but you can…you can do what you feel…"  Exhibit "C."  Ms. Uys also told Defendants that as a South African woman, she was not as inhibited as American women about showing her nude body. Harris Decl. at ¶22.    Ms. Uys was chosen to appear as Haima Kellis in the Film based on her resume, her audition, and her consent to appear nude in the required scenes. Harris Decl. at ¶22.

Before filming began, Ms. Uys executed a Personal Release, the subject matter of which is not the same as any subsequent agreement she signed.  Exhibit "D."  In that Personal Release she expressly agreed that Defendant Colhar Cinema was to own all rights of every kind in the Film, and that she waived any right to sue over her appearance of her voice, image, and property, in the

---

[1] All of the Exhibits cited herein are attached to the Declaration of Colin Harris (the "Harris Decl.") submitted contemporaneously with on this motion.

Film, a broad release which extends to Defendants use of all footage of Ms. Uys in the Film of which she now complains.  *Id.*

Ms. Uys then executed both a First and Second Letter of Agreement (Exhibits "E" and "F," respectively), providing Defendants the exclusive right to use and license of Ms. Uys's likeness and photograph, "by any means in and in connection with the film and the advertising, publicizing, exhibition, and/or other exploitation of the film."  *See* paragraph 4 of Exhibit "E" and "F."

Now, notwithstanding her express and unambiguous waiver of any claims arising out of these facts, and her broad agreement that gave Defendants complete control over the footage for the Film, Ms. Uys brings this lawsuit, alleging the breach of an alleged oral contract whereby the Defendants allegedly promised Ms. Uys that her naked breasts would not be shown in the Film. Amended Complaint at ¶25, and *see generally* the Amended Complaint Counts I, II, II, IV, V, VI, VIII.  However, the Personal Release, the First Letter of Agreement, and the Second Letter of Agreement, Exhibits D-F, all cover the written representation of the agreements between Ms. Uys and Defendants as to her participation in the film and the use of the footage.  Notably, the Second Letter of Agreement, Exhibit F, was executed after the complained of nude scenes were filmed, gave all control of the footage and its use to Defendants, and indicated that it superseded any oral agreement regarding the subject matter thereof, which included exclusive control of the footage to Defendants for use in "any and all means" Defendants chose.  *See* Exhibit F at opening, and ¶4.

Therefore, as a matter of law and documentary evidence[2], Ms. Uys's allegations regarding an oral contract regarding limitations on the use of footage filmed for, and incorporated in, the

---

[2] The Release and the First and Second Letter Agreements are documentary evidence, properly considered by the Court on a motion to dismiss under the 11th Circuit's exception to the general rule against documentary evidence in support of a motion to dismiss which states that a court may "consider a document attached to a motion to dismiss without converting the motion into one for

Film, are wholly without merit.  Ms. Uys must be held to the plain terms of the multiple, complete, and unambiguous agreements that she signed, and no oral agreements could be applicable based on those agreements made in writing. The Court does not need to look any further than the contracts themselves (Exhibits D-F) to determine Ms. Uys's claims are without merit. In short, Counts I, II, III, IV, V, VI, and VIII of the Amended Complaint should be dismissed.

Further, as a matter of law and documentary evidence, Ms. Uys's Count VII based on an allegation of joint authorship of the Film, should be dismissed as it there was no intention that Ms. Uys ever be considered a joint author or co-author of the work, nor an intention that any idea she volunteered would be merged into inseparable or interdependent parts of the Film as required by the Copyright Act, 17 U.S.C. section 101.  In fact, as a matter of documentary evidence, Ms. Uys has expressly stated that Defendant holds the copyright in and to the Film.  Her claims of joint authorship are manufactured for this lawsuit and Count VII of the Amended Complaint should be dismissed.

Finally, even all applicable written agreements that Ms. Uys executed did not dictate dismissal of the entire Amended Complaint, which they do, Ms. Uys's Amended Complaint does not, and could not plausibly, allege the necessary elements to state any of her claims as a matter of law.  For this additional and independent reason, the entire Amended Complaint should be dismissed pursuant to Federal Rule of Procedure 12(b)(6).

II.    FACTS

---

summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). "In this context, 'undisputed' means that the authenticity of the document is not challenged." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).  Those documents A-N attached to the Declaration of Colin Harris meet the standard for this exception.

A.      The Parties

1.      Defendants

Defendant Colhar Cinema was created as the entity to produce the Film in 2012, and was voluntarily dissolved on March 27, 2016, when it filed its Articles of Dissolution with the Florida Division of Corporations.  *See* Exhibit "A."  No claims were made by Ms. Uys against Defendant Colhar Cinema, LLC until April 2020 at the earliest.  *See* Harris Decl. at ¶47.

Defendant Harris is not a professional filmmaker by profession.  *Id.* at ¶¶4-8.  Defendant Harris has  21 years of distinguished Federal Service: six (6) year of active duty in the United States Air force supporting the Iraq War and War in Afghanistan, three (3) years as an Airfield Systems Specialist for the Department of Defense, and twelve (12) years at the Federal Aviation Administration (FAA); all while maintaining 21 years of active security clearance. *Id.* Defendant Harris is currently an Air Traffic Control (ATC) Systems and Security Specialist for the Federal Aviation Administration (FAA). *Id.* Defendant Harris is respected and trusted in his current career capacity so much that he is the sole System Specialist with the highest administrative access, permissions, and privileges on the ATC automation system.  I*d.*

Defendant Harris holds three Associates degrees, a Bachelor of Science degree in Electronics and Instrumentation Technology, a Master of Science degree in Management (Information Systems), a Specialist in Education degree in Curriculum and Instruction. *Id*. Defendant Harris is months away from completing a Doctor in Education degree from the University of West Florida. *Id*.

As to entertainment industry experience, Defendant Harris merely moonlighted as a hobbyist independent filmmaker on (3) three projects during his spare time: in 2006, 2012, and

4

2013; and, while serving in the Air Force, worked part-time as a wedding photographer and videographer. *Id.* at ¶¶9-12.

While working for the FAA, Defendant Harris saved part of his salary to fund his first attempt at a feature-length film, "Haima" (hereinafter the "Film"). Mr. Harris had no professional film experience at the time, nor did he have experience working on or in connection with feature-length films. *Id.*

In January 2012, Defendant Harris started the pre-production phase of the feature film "Haima" a microbudget, independent, non-union film with a $10,000 budget. *Id.*

2.      Plaintiff Inge Uys

Ms. Uys auditioned for, and was selected to appear as, the title role Haima Kellis in the Film and she entered into the three agreements concerning her appearance: A Personal Release, a January 1, 2013 Letter of Agreement, and a June 1, 2013 Letter of Agreement. *See* Exhibits D-F. In exchange, she was paid for her participation and was the lead actress in the Film. *Id.*

Prior to offering Ms. Uys the lead role in the Film, and execution of even the initial Agreement, Defendant Harris met with Ms. Uys in person at Winderley Place in Maitland, FL, and specifically discussed the Film would contain nudity and simulated sex. Harris Decl. at ¶19. Ms. Uys confirmed she was already aware of the nudity and sexual content as it was publicized in the casting call flyer. *Id.*, and Exhibit "B." Ms. Uys accepted the role being fully aware that the simulated sex scene called for nudity. Harris Decl. at ¶21. In fact, Ms. Uys commented to Defendant Harris that being a South African woman, she was not as inhibited as American women about showing her nude body. *Id.* at ¶22.

During filming, Ms. Uys acted in two scenes that called for her to be nude: a shower scene (requiring no clothing, but where her nude body was concealed by sitting with her knees drawn up to her chest) and a simulated sex scene (topless only).  *See* Film stills at Exhibits G and I.  The filming of the shower and the simulated sex scenes were on closed sets as Defendant had discussed with Ms. Uys, and both sets were  managed with integrity by Defendants.  The film was not a union production, therefore there was no nudity rider required.  Nor was a nudity rider executed as mentioned by Ms. Uys in her Amended Complaint.  However, the applicable express agreements Ms. Uys did execute give complete control over any footage for the Film to Defendants.  *See* Exhibits D-F.

On or about February 4, 2013, before shooting the scene "shower scene," Defendant Harris, in the presence of two female makeup artists,  instructed Ms. Uys to go into the bathroom for privacy, remove her clothes, get into the bathtub in position seated with her knees hugged to her chest to hide her body, and to notify him when she was ready to be filmed.  Ms. Uys declined the offer of privacy, and without hesitation she took off all of her clothing and underwear in front of Mr. Harris and the two female makeup artists. Harris Decl. at ¶29  There were no reasons creative, logistic, or otherwise, for Ms. Uys to expose her private areas in front of the crew as it was not required, and she had been instructed they were leaving for her privacy.  *Id.*

Similarly, before filming the simulated sex scene, on April 27, 2013, Harris instructed Ms. Uys and the co-actor to keep their bottoms on because the waist to the feet would be covered under the blanket. *Id.* at ¶30.  The male talent complied with Harris' directions.  *Id.* Ms. Uys did not.  *Id.* Ms. Uys started taking off her jean shorts and underwear. *Id.* Mr. Harris repeatedly told Ms. Uys that it was unnecessary to remove her bottoms as the scene did not require or justify it.  *Id*.  Still, Ms. Uys proceeded to remove her underwear. *Id.* Ms. Uys was never persuaded, pressured,

threatened, or manipulated. She took her clothes off because, as she stated, she wanted to. *Id.* at ¶ 31.  Ms. Uys had expressed a romantic interest in her male co-actor weeks before filming the simulated sex scene.   *Id.* at ¶32.   Still, the male co-actor conducted himself professionally throughout the filming.  *Id.* at ¶33.

B.      The Written Agreements

Given the clear and specific nature of the Agreements executed by Ms. Uys, described in more detail below, there is simply no basis for Ms. Uys to now bring a claim based on exactly the circumstances that were the subject of her releases and agreements, specifically the use, exploitation, and exhibition of the Film and its contents.

1.      The Appearance Release

Along with her audition to be Haima Kellis in the Film, Ms. Uys executed a "Personal Release" on October 20, 2012 (hereinafter the "Personal Release").  By this Personal Release, Ms. Uys agreed not to sue and unconditionally released  Defendants from any and all "claims, causes of action, suits, cost liabilities and damages whatsoever that I now or hereafter may have against them in connection with the preparation, production and use" of the material that went into the Film.  *See* Exhibit "D."

Therefore, Ms. Uys expressly released the claims she now attempts to bring against Defendants related to her appearance in the Film.  The Subsequent Letter of Agreement executed by Ms. Uys does not address the subject matter of the Personal Release, and therefore the Personal Release is not superseded by the Second Letter of Agreement.

2.      The January 1, 2013 Letter of Agreement

Next, after she was selected for the title role in the Film, but before the filming of the nude scenes at issue in the Amended Complaint, Ms. Uys signed a Letter of Agreement on January 14, 2013, with an effective date of January 1, 2013 (hereinafter the "First Letter of Agreement"). *See* Exhibit "E." By this First Letter of Agreement, Ms. Uys expressly acknowledged that it was made in connection the Film, and acknowledged the parties' mutual agreement that her contribution to the Film was viewed as a work for hire:

> Artist and Producer agree that Artist's contribution is viewed as "work for hire", and that the completion of work as described constitutes the entirety of this agreement.

*See* paragraph 1 of Exhibit "E." This evidences Ms. Uys and Defendants' mutual agreement that there was no joint authorship intended as to the Film.

The First Letter of Agreement also expressly set forth that Defendants' had:

> …[T]he exclusive right to use and to license the use of [Ms. Uys's] name, photograph, likeness and/or voice by any means in and in connection with the film and the advertising, publicizing, exhibition, and or other exploitation of the film.

*See* paragraph 4 of Exhibit "E."

The First Letter of Agreement further expressly held that, as to the Film footage, Ms. Uys was not entitled to anything more than the use of "portions of the [Film] in which [Ms. Uys] appears for [Ms. Uys's ] demo reel. *See* paragraph 8 of Exhibit "E." Therefore, nothing in the Personal Release, nor the First Letter of Agreement, indicated a mutual intention to be joint authors, nor did those agreements provide Ms. Uys to the right to any unedited footage, referred to in the film industry as dailies, nor to use of the entire Film.

     3.      June 1, 2013 Letter of Agreement

On June 3, 2013, Ms. Uys executed a second Letter of Agreement effective June 1, 2013 (hereinafter the "Second Letter of Agreement").   *See* Exhibit "F."   This Second Letter of Agreement was to be for the very limited purpose of changing the definition of the duration of filming of Ms. Uys to a number of days (instead of just hours) and extending the filming period through August 7, 2013 so that Ms. Uys could use her participation in the film as a summer internship in college.   *See* ¶1 of Exhibit "F," and ¶¶37-39 of the Harris Decl.   There was no discussion of a mutual intent to make Ms. Uys joint-author of the Film.

The  change necessitating the Second Letter of Agreement was specifically requested by Ms. Uys in a May 30, 2013 e-mail to Defendants.   *See* Exhibit "J."   That e-mail specifically requested the only change to the agreement was to the "underlined portions" in paragraph 1 of the First Letter of Agreement, and Ms. Uys requested Defendants send her a revised copy of the agreement to sign to effect that limited change.

For comparison, the underlined portions of paragraph 1 of the First Letter of Agreement stated:

> It is agreed that the Artist shall make herself available to perform said role for <u>140</u> hours of filming, commencing on <u>01/05/2013</u> and concluding on <u>06/30/13</u> in the furtherance of the completion of the picture.

*See* ¶1 of the First Letter of Agreement (underlined as in original).   Ms. Uys requested that portion of ¶ 1 be changed, and Defendants did make that change so that that portion of the Second Letter of Agreement read:

> It is agreed that the Artist shall make herself available to perform said role for **<u>9-10</u> filming days of approximately <u>10 hours each</u>**, commencing on **<u>06/01/2013</u>** and concluding on **<u>08/07/2013</u>** in the furtherance of the completion of the picture.

*See* ¶1 of the Second Letter of Agreement (underlined as in the Second Letter of Agreement, bold added to note language that changed from the First to the Second Letter of Agreement as requested by Ms. Uys).

The fact that the second sentence of the First Letter of Agreement is absent from the Second Letter of Agreement is merely a mistake, an editing error on Defendants' behalf while making the limited change requested by Ms. Uys.  *See* Harris Decl. at ¶40.  There was no request by Ms. Uys that the "work for hire" provision be removed from the agreements, and there was no mutual assent to Ms. Uys being a joint author of the Film.

Paragraphs 4 and 8 of the Second Letter of Agreement were identical to the First Letter of Agreement, to wit:

> …[T]he exclusive right to use and to license the use of [Ms. Uys's] name, photograph, likeness and/or voice by any means in and in connection with the film and the advertising, publicizing, exhibition, and or other exploitation of the film.

*See* ¶ 4 of Exhibit "F."

> The January 1, 2013 Letter of Agreement further expressly held that, as to the Film footage, Ms. Uys was not entitled to anything more than the use of "portions of the [Film] in which [Ms. Uys] appears for [Ms. Uys's ] demo reel.

*See* ¶8 of Exhibit "F."

Further, the Second Letter of Agreement expressly was only to supersede prior agreements and understandings (whether written or oral) as to the subject matter of the Second Letter of Agreement.  Since the work for hire provision of the First Letter of Agreement is not a subject of the Second Letter of Agreement, then the First Letter of Agreement stands as to the work for hire provision.  Additionally, releases from liability granted by Ms. Uys to Defendants are not a subject of the Second Letter of Agreement, therefore releases of Defendants from any liability pertaining to use of the footage filmed of Ms. Uys and its appearance in the Film also remain effective.

On October 11, 2016, Defendants complied with the requirement of ¶ 8 of the Second Letter of Agreement, by providing Ms. Uys with the portions of the Film in which she appeared so that she could use same in her demo reel.  *See* Exhibit "K."  At that point, Defendants were under no further obligation to provide Ms. Uys with any footage regarding the Film.

C.      Ms. Uys's Nude Appearances in the Film

As outlined in the Personal Release, First Letter of Agreement, and Second Letter of Agreement, Ms. Uys did participate in filming as the lead actress in the Film.  In the film, Ms. Uys appears in one shower scene in which no portion of her breasts or private areas can be seen.  *See* Exhibit "I."  Ms. Uys also appeared in a less than one minute simulated sexual intercourse scene, which was known to Ms. Uys from the audition notice (Exhibit "B"), and to which Ms. Uys consented during meetings with Defendants prior to filming.  *See* Harris Decl. at ¶19.  The simulated sex scene was shot, as promised on a closed and professionally run set with only required cast and crew present.  *Id.* at ¶62.  Although nudity below the waist was not required or requested for the scene, Ms. Uys removed all her clothing, including underwear for the filming of the simulated sex scene.  *Id.* at ¶30.  The scene was filmed from the vantage point of the doorway of the bedroom, and edited to be clear that the scene was being viewed by a third-party peeping Tom watching the action from the open bedroom door.  *See* Exhibit "G", "H" [3], and Harris Decl. at ¶42.  Ms. Uys's scene partner was positioned lying down on the bed, and Ms. Uys was on top of her scene partner straddling his waist with her back toward the bedroom door.  *See* Exhibit "H" at minute 30:50 to 31:47, and Exhibit "G."  Other than portions of the volume of her breasts from a

---

[3] Due to size, Exhibit "H," a true and correct copy of the film, has been sent to the Court via overnight delivery, and served on Plaintiff's counsel via a dropbox link.

side view, Ms. Uys's "naked breasts" are not on display in the Film.  *See Id.*  Her assertions in the Amended Complaint that her "naked breasts" appear in the Film are misleading and self-serving.

Further, through filming, Ms. Uys portrayed herself as a person free with exposure of her naked body and indicated that as a South African woman, she was not as inhibited as American women about showing her nude body.  Harris Decl. at ¶22.   Ms. Uys was aware of the position of the camera at all times during filming of the simulated sex scene (filmed in her own bedroom), *see* Harris Decl. at ¶26, and agreed in the First and Second Letter of Agreement that Defendants had the exclusive right to use of the footage as Defendants saw fit in connection with the film.  *See* Exhibits "E" and "F."

Therefore, this Motion to Dismiss can be decided on the face of the Amended Complaint, and documentary evidence including the Personal Release, First Letter of Agreement, Second Letter of Agreement, Audition Notice, May 30, 2013 e-mail, and footage from the Film, all of which are integral to the claims of Plaintiff's Amended Complaint, and not disputed.  *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).  Further, the Audition Notice (*see* Am. Complaint at ¶¶10-11), First Letter of Agreement (*see* Am. Complaint at ¶¶26 and 31)[4], Second Letter of Agreement (*see* Am. Complaint at ¶¶51), Corporate formation and dissolution documents (*see* Am. Complaint at ¶¶17-18), and the Film itself (*see* Am. Complaint throughout) are all specifically referenced by the Amended Complaint, but not attached, further evidencing their status as integral to Ms. Uys's claims.

   D.    Ms. Uys Expressly Admits Defendants Are Sole Copyright Owners of the Film

---

[4] Note, the Amended Complaint purports to attach the First and Second Letters of Agreement as exhibits A & B, but not exhibits were actually filed on the Docket at D.E. 18.

At its core, this is not a lawsuit by Ms. Uys to attempt to right any actual wrongs for which she has actually been damaged. This lawsuit is a punitive attempt by Ms. Uys to scrub the Film, and its unedited footage, from existence as she "is in a new phase" of her life, "engaged and would like to start a family." *See* Exhibit "M," the 2020 Facebook Messages. These 2020 Facebook Messages are integral to Ms. Uys's Amended Complaint because she claims she is a joint author of the Film, and in these messages she expressly admits that because of her "new phase" of life she wished to obtain "a digital copy of [the Film] and the out-takes from all scenes with sex and/or nudity," and that Defendants should have no fear of sharing the Film and Film out-takes as Defendants "have copyright and [Ms. Uys] shall not share the footage with anyone or upload it anywhere." *See* Exhibit "M." It is only after Defendants declined to provide Ms. Uys with the copies requested that she began to assert the baseless claims that now have taken the form of the Amended Complaint.

Therefore, there is further documentary evidence in the 2020 Facebook messages, that Ms. Uys is making a false claim to co-authorship in the Film and its footage. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

E.      Procedural History

Ms. Uys's Complaint and its Exhibits A and B, were filed at D.E. 1 - 1-2[5] on June 26, 2020. Defendants' Waivers of the Service of Summons, D.E. 15-16, were signed on June 10, 2020, requiring an answer or motion under Rule 12 within 60 days of July 7, 2020 which was Saturday, September 5, 2020. Ms. Uys then filed her Amended Complaint, without attaching any exhibits, on July 17, 2020 at D.E. 18.

---

[5] D.E. refers to Docket Entry.

Due to the date of Defendants' response falling on a weekend, and the Labor Day holiday, this response is timely filed on the next business day, September 8, 2020.  The Harris Decl. in Support of this Motion is being filed concurrently with this response.

III.    ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (*quoting Twombly*, 550 U.S. at 555).

Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted).  Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679 (*citing Twombly*, 550 U.S. at 556) (emphasis added).  To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (*citing Twombly*, 550 U.S. at 556).

As discussed in footnote 2 above, a court may "consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). "In this context, 'undisputed' means that the authenticity of the document is not challenged." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

14

A.      Ms. Uys's  Claims are Barred by Three Signed Agreements and Must be Dismissed

1.      The Personal Release is Documentary Evidence that Completely Disposes of the Complaint

In cases like this one, where a clear and complete written agreement, the Personal Release, precludes the possibility of relief, a court must dismiss the complaint.  The 11th Circuit has long held that exculpatory provisions in contracts are enforceable. *Pier 1 Cruise Experts v. Revelex Corp.*, 929 F.3d 1334, 1344 (11th Cir. 2019); *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1168 n.9 (11th Cir. 2009).

In keeping with these well-established principles, appearance releases for television and film productions are strictly enforced.  The spate of cases arising out of the movie Borat provides persuasive evidence that the execution of an appearance release in connection with movies or television will necessarily result in dismissal of an action. In *Psenicksa v. Twentieth Century Fox Film Corp.*, 2008 WL 4185752 (S.D.N.Y. Sept. 3, 2008), aff'd, 409 Fed. Appx. 368 (2d Cir. 2009), the court addressed various releases signed in connection with Borat, a "documentary-style" film. In the film, a comedian pretended to be an uncouth immigrant from a foreign country and he was filmed interacting with real people, embarrassing and insulting them with his offensive behavior. Plaintiffs in that case were several of these ordinary people, who claimed they had been led to believe the film would be a traditional documentary and were unhappy with how they were depicted. They sued the producers, asserting claims for, inter alia, and as here, fraudulent inducement and, intentional infliction of emotional distress.

Because each plaintiff had signed an appearance release, the court dismissed the claims. The releases "contain[ed] an explicit waiver clause that on its face prevent[ed] Plaintiffs from

bringing the ... actions." *Id.* at *4.    The court found that the language of the releases was unambiguous and clearly barred the plaintiffs from suing. *Id.* at *2. The Second Circuit, in authority that is persuasive in this case, affirmed the dismissal, rejecting plaintiffs' arguments for the reinstatement of their fraudulent inducement claims and, in language equally applicable here, invoked "the rule holding parties to the terms of written releases." *Psenicksa,* 409 Fed. Appx. at 371.

Like the plaintiffs in *Psenicksa*, Ms. Uys cannot evade the plain terms of the multiple agreements that she executed, especially the Personal Release. She was not in any way obligated to appear in the Film. She voluntarily chose to do so, and in consideration for an appearance payment and a shot at fame, she agreed not to bring a lawsuit based on her participation in the Film.  In addition to stating, in no uncertain terms, that Ms. Uys waived any right to sue, the agreements stated many times that Defendants retained all control over the use, and exhibition of the footage for the Film.

In the face of these unambiguous agreements and releases executed by Ms. Uys, there is no basis for her claims. Consistent with the case law strictly enforcing television and film releases, this Court must hold Ms. Uys to the terms of the agreements she freely entered into.

Given her repeated and express acknowledgment in the agreements that all footage of her could be used by any means and in connection with the Film, Ms. Uys is in no position to argue that the use of footage in which she appeared topless was unanticipated.   Nor is she in the position to argue that the childhood photograph she freely gave Defendants for use in the Film was inappropriately used.  However, as she has made those exact arguments they must fail.  In *Spiegel v. Schulmann*, a plaintiff who agreed to the use "in any manner of any and all photographs ... of [himself] ... whatsoever" was barred from bringing claims based on an altered version of his photo,

even though he "might not have anticipated" the unflattering alterations. 604 F.3d 72, 78 (2d Cir. 2010). *See also Myskina v. Conde Nast Publ'ns, Inc.*, 386 F. Supp. 2d 409,414 (S.D.N.Y. 2005) (contract authorizing "unrestricted editorial use" of photo shoot barred claims for use of topless photos model had thought would not be published).

In sum, the Personal Release, and First and Second Letters of Agreement plainly cover the claims at issue here.  The documentary evidence submitted by Defendants on this motion conclusively demonstrates the existence of these agreements, their content, and the fact that Ms. Uys signed each one. *See* Exhibits "D"-"F." There are no factual issues that require resolution, and the clear language of Ms. Uys's releases and agreements conclusively dispose of this Amended Complaint. To allow this case to go forward would permit the plaintiff to "avoid the clear wording of [her] own contract[s]" in precisely the manner proscribed by *Psenicksa*. *Psenicksa*, 2008 WL 4185752 at *6. In short, Ms. Uys's claims are barred by her written agreements and must be dismissed.

Contrary to Ms. Uys's allegations that some specific oral agreement was made limiting the use of footage filmed for the Film, the Second Letter of Agreement, executed by Ms. Uys long after the filming of the nude scenes, granted Defendants broad rights to use her likeness in connection with the Film. *See* Exhibit "F."  Thus, without the alleged oral contract, which the terms of the Second Letter of Agreement expressly preclude (*see* Exhibit "F" infra), Ms. Uys cannot possibly allege that any footage of her was ever used with anything other than her full consent. *See* generally Amended Complaint  (basing claims on allegation of oral contract to limit the use of her nude footage), and compare with Exhibit "D" releasing all claims related to use of footage of Ms. Uys, and Exhibit "F" granting exclusive and broad control over all footage to Defendants.

B.      Ms. Uys Cannot Avoid the Plain Terms of Her Agreements

Like the plaintiffs in *Psenicksa*, Ms. Uys is seeking to "avoid the consequences of [her] waiver[]", *Psenicksa*, 2008 WL 4185752 at *6, by alternatively arguing either that an oral contract agreeing to regarding nudity was distinct from the agreements she executed, or that the agreements are not enforceable. Neither argument is supported by the undisputed facts she has pled, the operative agreements or the governing law. Indeed, as established above, television and movie appearance releases are routinely enforced, despite alleged contrary oral commitments. Further, the Second Letter of Agreement opens with a statement expressly precluding any oral agreement. *See* Exhibit "F."

C.      Even if Not Barred by Her Releases, Ms. Uys's Claims Fail as a Matter of Law

Even assuming arguendo that her multiple, signed releases do not bar Ms. Uys's claims, she still cannot prevail on any of her claims, because it is clear from the complaint and the documentary evidence that she fails to state the necessary elements of her claims.  As Ms. Uys alleges in ¶7 of the Amended Complaint "a substantial part of the events giving rise to the claims occurred in [the Middle District of Florida]."  Therefore, Florida law is applicable to Ms. Uys's claims.

1.      Breach of Contract Counts I and II

Ms. Uys alleges a breach of an alleged oral agreement in Counts I and II.  However, these claims fail to sufficiently state damages which is material element of each of those claims.  *Scott-Steven Development Corp. v. Gables by the Sea, Inc.*, 167 So.2d 763, 764 (Fla. 3d DCA 1964), cert. denied, 174 So.2d 32 (Fla. 1965).  Not all breaches of contract result in damages and the law furnishes a remedy only for such wrongful acts as result in damages.  *Id.*  Ms. Uys makes no more

that mention damages in a mere recitation of the elements of the claim in Counts I and II, which is not sufficient to state a claim.  Therefore, Counts I and II should be dismissed pursuant to FRCP 12(b)(6).

2.      Promissory Estoppel Count III

An action for promissory estoppel fails upon a showing that an express contract exists. *Williams v. Bear Sterns & Co.*, 725 So.2d 397, 400 (Fla. 5th DCA 1998), rev. denied, 737 So.2d 550 (Fla. 1999).  Further, promissory estoppel is not controlling on oral employment contracts. *Keller v. Penovich*, 262 So.2d 243, 244 (Fla. 4th DCA 1972).  Finally, promissory estoppel is not a doctrine designed to give a party to a contract a second bite at the apple in the event it fails to prove breach of contract.  *Gen. Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1042 (6th Cir. 1990); *Advanced Marketing Systems Corp. v. ZY Yacht Sales*, 830 So.2d 924, 928 (Fla. 4th DCA 1990).

For all these reasons Ms. Uys cannot state a claim for Promissory Estoppel upon the facts she has alleged.  Therefore, Counts III should be dismissed pursuant to FRCP 12(b)(6).

3.      Fraud in the Inducement of a Contract Count IV, Invasion of Privacy (Public Disclosure) Count V, and Intentional Infliction of Emotional Distress Count VI

The Amended Complaint does not begin to plausibly allege the necessary culpable conduct required for a claim for Ms. Uys claims regarding Fraud in the Inducement (Count IV), Invasion of Privacy (Count V) and Intentional Infliction of Emotional Distress (Count VI).

As to Fraud in the Inducement (Count IV), even liberally construing the allegations of Ms. Uys's Amended Complaint, fraud cannot be predicated upon a mere promise not performed. *Alexander/Davis Properties, Inc. v. Graham*, 397 So.2d 699, 706 (Fla. 4th DCA 1981), petition for

19

rev. denied, 408 So.2d 1093 (Fla. 1981).  Further, Ms. Uys entered into three written agreements, one after the filming of the complained of sex scene, and all of them give full control to Defendants over the exhibition, distribution, and public display of all the footage of Ms. Uys shot for the Film. Therefore, any conversation in which plan for the editing of the footage was discussed prior to the actual editing of the Film is, at best and in the light most favorable to Ms. Uys, an expression of an opinion made without intent not to perform.

For all these reasons Ms. Uys cannot state a claim for Fraud in the Inducement (Count IV) upon the facts she has alleged.  Therefore, Counts IV should be dismissed pursuant to FRCP 12(b)(6).

As to Invasion of Privacy (Public Disclosure) (Count V), the elements of the course of action in Florida can be summarized as (1) the publication, (2) of private facts, (3) that are offensive, and (4) are not of public nature.  *Cape Publ'ns, Inc. v. Hitchner*, 549 So.2d 1374, 1377 (Fla. 1989).  Even viewing the allegations of the Amended Complaint in the light most favorable to Ms. Uys, she voluntarily removed all her clothing for filming of a simulated sex scene in an independent feature film.  Though she has tried, in a mere recitation of the elements of this cause of action, she cannot plausibly allege that the appearance of any portion of her naked body in the final Film is somehow "highly offensive to a reasonable person."  If that were plausible, it would have the absurd effect of making every simulated sex scene containing partial breast nudity, in every feature film, an invasion of privacy of the actor who voluntarily submitted to the filming of such a scene and then experiences buyer's remorse.

For all these reasons Ms. Uys cannot state a claim for Invasion of Privacy (Count V) upon the facts she has alleged.  Therefore, Counts V should be dismissed pursuant to FRCP 12(b)(6).

As to Intentional Infliction of Emotional Distress (Count VI), the standard is rigorous and difficult to satisfy. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Metropolitan Life Ins. Co. v. McCarson,* 467 So.2d 277, 278-79 (Fla. 1985) *(quoting Restatement (Second) of Torts § 46 (1965)).*This exceedingly strict standard requires far more than anything that has been, or could be, alleged in this case.

Here, Ms. Uys's claims are based on Defendants use of seconds of footage where the volume of Ms. Uys's breast (only one at a time, never both, and never full frontal bare breasts) appears. *See* Ex. H at 30:50 to 31:47.  In the context of a scene that is simulating sext, where Ms. Uys is an actress who has taken off her clothes for filming, and for which she has agreed in writing that Defendants have broad control over the use of all footage for the Film, the seconds use of side views of one or the other of her breasts cannot possibly rise to the level of "outrageous," "exceeds all bounds of decency" or "intolerable in a civilized society" conduct required to state a claim of Intentional Infliction of Emotional Distress. Ms. Uys's conclusory labeling of such a use of the footage in the Film using those keywords, made without any supporting facts not contradicted by the written agreements in this case, are insufficient to withstand a motion to dismiss.

For all these reasons Ms. Uys cannot state a claim for Intentional Infliction of Emotional Distress (Count VI) upon the facts she has alleged.  Therefore, Counts VI should be dismissed pursuant to FRCP 12(b)(6).

As to the Deceptive and Unfair Trade Practices claim (Count VIII), Ms. Uys cannot state a claim as she is not a consumer who had suffered a loss as a result of a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  *See* Section 501.211(2), Fla. Stat.  The

21

primary purpose of FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."  Section 501.202(2), Fla. Stat. Ms. Uys is not a consumer in this instance, and even if she can be construed as such she has not alleged any actual damages under FDUTPA, which are defined in the context of FDUTPA as "the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered." *Rollins, Inc. v. Heller*, 454 So.2d, 580, 585 (Fla. 3d DCA 1984).  Ms. Uys is an actress who appeared nude in a simulated sex scene, and now at a new stage of her life is experiencing buyers remorse for her own conduct.

For all these reasons Ms. Uys lacks standing as a consumer, and has not stated any actual damages, and cannot state a claim for FDUTPA upon the facts she has alleged.  Therefore, Count VIII should be dismissed pursuant to FRCP 12(b)(6).

Finally, as to Count VII, Failure to Account, Ms. Uys makes unsupported allegations that she is a joint author of the Film and thus entitled to an accounting of the revenue of the Film.  There was no mutual intent that Ms. Uys's ideas as to character backstory, or fight choreography make her a joint author of the Film, and Ms. Uys has attached nothing to the Amended Complaint evidencing an independently copyrightable work. The rule is that to qualify as a joint author, one's contribution must be independently copyrightable. *MacNeill v. Yates*, No. 6:09-cv-706-Orl-31DAB, 2010 U.S. Dist. LEXIS 57731, at *11-12 (M.D. Fla. June 10, 2010) ("It is well settled that ideas alone are not copyrightable. 'In no case does copyright protection for an original work of authorship extend to any idea,. . . concept, . . . regardless of the form in which it is described, explained, illustrated, or embodied in such work.' 17 U.S.C. § 102(b).")

22

For all these reasons Ms. Uys cannot state a claim for Failure to Account upon the facts she has alleged.  Therefore, Count VII should be dismissed pursuant to FRCP 12(b)(6).

For these additional and independent reasons, the entirety of Ms. Uys's Amended Complaint should be dismissed.

IV.     CONCLUSION

For the reasons stated herein, Defendants, Harris and Colhar Cinema, respectfully request that this Honorable Court grant this motion, dismiss the Amended Complaint in its entirety with prejudice and award Defendants any further relief this Honorable Court deems just and proper.

Dated: September 8, 2020                    Respectfully submitted,

                                            s:/ Spensyr Ann Krebsbach
                                            Lorri Lomnitzer, Esq.
                                            Florida Bar No. 37632
                                            Lorri@Lomnitzerlaw.com
                                            Spensyr Ann Krebsbach, Esq.
                                            Florida Bar No. 085132
                                            Sak@Lomnitzerlaw.com
                                            THE LOMNITZER LAW FIRM, P.A.
                                            7999 N. Federal Highway, Ste. 202
                                            Boca Raton, FL 33487
                                            Telephone: (561) 953-9300
                                            Fax: (561) 953-3455
                                            *Attorneys for Defendants*